UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JANE C.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:21-cv-00187-KMB-SEB |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

Claimant Jane C. applied for disability insurance benefits from the Social Security Administration ("SSA") on September 8, 2019, alleging an onset date of March 31, 2019. [Dkt. 5-2 at 11.] Her application was initially denied on December 27, 2019, [Dkt. 5-5 at 7], and upon reconsideration on May 22, 2020, [Dkt. 5-5 at 13]. Administrative Law Judge Lloyd E. Hubler III ("ALJ") conducted a hearing on November 23, 2020. [Dkt. 5-2 at 29-55.] The ALJ issued a decision on March 1, 2021, concluding that Jane was not entitled to receive benefits. [Dkt. 5-2 at 8-21.] The Appeals Council denied review on September 22, 2021. [Dkt. 5-2 at 2.] On November 24, 2021, Jane timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g). [Dkt. 1.]

---

[1] To protect the privacy interests of claimants for Social Security benefits, and consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

# I. STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Stephens*, 888 F.3d at 327. "[S]ubstantial evidence" is such relevant "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled." *Stephens*, 888 F.3d at 327. Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'" *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)). The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)). The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of

the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted). "If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v). The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Stephens*, 888 F.3d at 327. When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021). Typically, a remand is also appropriate when the decision is not supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

## II. BACKGROUND

Jane was 59 years old when her alleged disability began. [Dkt. 5-7 at 2.] She had completed high school and previously worked as a mail clerk and waitress. [Dkt. 5-8 at 22-23.][2]

The ALJ followed the five-step sequential evaluation set forth by the Social Security Administration in 20 C.F.R. § 404.1520(a)(4) and ultimately concluded that Jane was not disabled. [Dkt. 5-2 at 20-21.] Specifically, the ALJ found as follows:

- At Step One, Jane had not engaged in substantial gainful activity[3] since March 31, 2019, the alleged onset date. [Dkt. 5-2 at 13.]

- At Step Two, she had "the following severe impairments: lumbar degenerative disc disease; obesity; right inguinal hernia; hypertension; coronary artery disease; cardiac disease; bilateral hip bursitis; and mild bilateral patellofemoral osteoarthritis." [Dkt. 5-2 at 13 (citation omitted).]

- At Step Three, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [Dkt. 5-2 at 15.]

- After Step Three but before Step Four, Jane had the RFC "to perform light work as defined in 20 CFR 404.1567(b) except the claimant can frequently climb ramps, stairs, ladders, ropes, or scaffolds; and can frequently balance, stoop, kneel, crouch, or crawl." [Dkt. 5-2 at 16.]

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Jane's RFC, she was capable of performing her past relevant work as a server, housekeeper, and cook as actually performed, and as a server and clerical worker as generally performed. [Dkt. 5-2 at 20.]

---

[2] The relevant evidence of record is amply set forth in the Parties' briefs and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

## III. DISCUSSION

Jane raises three alleged errors, arguing that the ALJ failed to: (1) adequately address the prior administrative medical findings of the state agency consultants, (2) adequately address the opinions of Jane's treating physicians, and (3) consider the effect of obesity on Jane's other impairments. [Dkt. 14 at 2-3.] The Court will address the issues as necessary to resolve the appeal beginning with an issue that is dispositive.

### A.  Treating Physician's Opinion

Jane contends that the ALJ erred by failing to explain which aspects of the opinions of David Welsh, M.D., and Stephen Glaser, M.D., the ALJ found unpersuasive because the treating sources had assessed "extreme" functional limitations. [Dkt. 15 at 23.] She also contends that the ALJ mischaracterized the opinions as extreme. [Dkt. 15 at 23.] She further contends that the ALJ failed to evaluate the factors required by the regulations: supportability and consistency. [Dkt. 15 at 23.] Jane asserts that Dr. Welsh's opinion is more restrictive than Dr. Glaser's, but both assessed limitations that are less than extreme. [Dkt. 15 at 24-25.] Jane argues that review is frustrated because the ALJ addressed the opinions together and characterized them both as extreme. [Dkt. 15 at 24-27.]

The Commissioner contends that the ALJ applied the proper legal standards to the opinions of Drs. Glaser and Welsh because the ALJ found that the opinions were neither supported by the sources' own treatment notes or consistent with the evidence of record. [Dkt. 16 at 14.] She further contends that the ALJ adequately articulated his reasoning because he incorporated his prior discussion of benign physical examination findings, Jane's conservative treatment history, and her substantial activities of daily living, and that such an approach is not error because it would be a needless formality to have the ALJ repeat substantially similar factual analyses throughout the

5

decision. [Dkt. 16 at 14-15.] The Commissioner argues that the ALJ's characterization of Dr. Glaser's opinion as extreme is reasonable when compared with the rationales identified by the ALJ, and portions of Dr. Glaser's opinion were inconsistent with other portions. [Dkt. 16 at 15.] The Commissioner provides examples that Dr. Glaser indicated that Jane had no significant limitations with the use of her upper extremities, but Dr. Glaser assessed that Jane could use her upper extremities no more than 50% of the workday for grasping, fine manipulation, and reaching. [Dkt. 16 at 15.] The Commissioner also notes that Dr. Glaser assessed that Jane could stand for no more than one hour at a time and needed unscheduled breaks, but Dr. Glaser did not adequately support his assessments because he referenced only that Jane's physical examinations were okay, she moved a little slowly getting onto the exam table, and she took routine medications like aspirin, blood pressure medication, and cholesterol medication. [Dkt. 16 at 15.] The Commissioner also argues that one need look no further than the ALJ's RFC finding to determine the aspects of Dr. Glaser's opinion that the ALJ rejected as extreme, the ALJ is not required to parse out which individual limitations he found more persuasive than others within an opinion from a medical source, and the ALJ is required to analyze the persuasiveness of medical opinions on only a source-level basis. [Dkt. 16 at 15-16.]

In Jane's reply, she argues that figuring out how the ALJ determined that the treating opinions were extreme requires guesswork and *post hoc* rationalizations that only serve to frustrate meaningful judicial review. [Dkt. 17 at 1-2.] She contends that the problem with the Commissioner's argument—that one need only look at the ALJ's RFC finding to determine the aspects of Dr. Glaser's opinion that the ALJ rejected as extreme—is that it asks the Court to create the necessary and logical bridge from the "flawed analysis of the medical opinions . . . to justify

the RFC that was ultimately crafted by the ALJ." [Dkt. 17 at 2.] Jane also contends that the ALJ expressly found both opinions unpersuasive in their entirety. [Dkt. 17 at 3.]

According to the regulatory scheme for claims like Jane's that were filed on or after March 27, 2017, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),[4] including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). The SSA continues to use factors to evaluate the "persuasiveness of medical opinions and prior administrative medical findings" but the "most important factors" to be considered are "supportability" and "consistency." *Id*. How those factors were considered must be "explain[ed]" in the decision. *Id*. at 404.1520c(b)(2). "Supportability" considers the relevance of "the objective medical evidence and supporting explanations presented by a medical source." *Id*. at 404.1520c(c)(1). "Consistency" is compared "with the evidence from other medical sources and nonmedical sources in the claim." *Id*. at 404.1520c(c)(2). Explicit consideration of the remaining factors is permitted, but not always required, except upon a finding that "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same . . . ." *Id*. at 404.1520c(b)(2)-(3). The remaining factors are the source's: (1) "[r]elationship with the claimant" including the "[l]ength of the treatment relationship," "[f]requency of examinations," "[p]urpose of the treatment relationship," "[e]xtent of the treatment relationship," and "[e]xamining relationship;" (2) "[s]pecialization;" and (3)

---

[4] Administrative medical findings are determinations made by a state agency medical or psychological consultant at the initial or reconsideration level about a claimant's case, "including, but not limited to, the existence and severity of [her] impairment(s), the existence and severity of [her] symptoms, whether [her] impairment(s) meets or medically equals the requirements for any impairment listed in appendix 1 to this subpart, and [her] residual functional capacity." 20 C.F.R. § 404.1513a(a)(1).

7

"[o]ther factors," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements."  *Id*. at 404.1520c(c)(3)-(5).

The ALJ addressed the assessments of Jane's physicians:

> As for the opinion evidence, the undersigned finds the treating source statements from David Wels[]h, M.D. and Stephen Glaser, M.D., not persuasive, as the doctors opined extreme functional limitations that are not supported by, or consistent with the benign findings on physical examinations; conservative, routine treatment history, or activities of daily living more fully discussed above, as well as the claimant's testimony.  Indeed, the claimant testified and has reported that she can lift up to twenty pounds and that her doctor told her not to lift over twenty pounds[.] Dr. Glaser also limited the claimant to lifting twenty pounds occasionally, which is consistent with the limitations set forth in the residual functional capacity found herein.  Notably, the testimony from the claimant regarding the limitations told to her by her doctor is inconsistent with the limitations that the doctor provided in the treating source statement.

[Dkt. 5-2 at 19 (citations omitted).]

On October 28, 2020, Dr. Glaser, Jane's primary care provider, assessed that she could sit for two hours at one time and four hours total in an eight-hour workday, she could stand for one hour at a time and stand/walk for a four hours total in a workday, she would need to get up and walk for five minutes every two hours, she would need one unscheduled break per day that lasted five minutes, she could occasionally[5] lift and carry up to 20 pounds, she could never lift and carry 50 pounds, and she did not have significant limitations reaching, handling, or fingering, but she was limited to using her bilateral hands and arms 50% of the workday for gross manipulation, fine manipulation, and reaching.  [Dkt. 5-22 at 33-36.]  None of the limitations that Dr. Glaser assessed appear so obviously extreme that they can be rejected without any further explanation.

---

[5] The form filled out by Dr. Glaser defines "occasionally" as between 6% and 32% of an eight-hour workday.  [Dkt. 5-22 at 34.]

For context, the ALJ found that Jane was limited to range of a light exertional work. By regulation:

> Light work involves lifting no more than 20 pounds at a time with frequent[6] lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b). As explained above, the ALJ found Jane not disabled at Step Four based on the VE's testimony that she could have performed her past relevant work as server, housekeeper, cook, and clerical work. The VE testified that those occupations are typically performed at the light exertional level or above and Jane performed her relevant jobs at least at the light level, *i.e.*, Jane did not perform any past relevant work at the sedentary exertional level and none of the occupations she performed are typically performed at the sedentary level. [Dkt. 5-2 at 51-53.] The VE's testimony did not establish if the rather modest limitations assessed by Dr. Glaser—for example, that Jane would need to spend half of an eight-hour workday sitting, she could only occasionally lift and carry any weight up to twenty pounds, or she would be limited to reaching for half a workday—would preclude her past relevant work as a server, housekeeper, cook, and clerical worker. Based on Jane's age categories during the period at issue, education, and work experience, if she was unable to perform her past relevant work, even if she could perform some

---

[6] "'Frequent' means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Social Security Ruling 83-10 (S.S.A. 1983), 1983 WL 31251, at *6.

9

unskilled[7] light exertional occupations, the Medical-Vocational Guidelines would direct a finding of "disabled." *See* 20 C.F.R. § Pt. 404, Subpt. P., App. 2, Rule 202.06. Accordingly, careful consideration of Dr. Glaser's opinion is necessary because the evaluation appears material—at least to the extent the issues were developed with the VE—to an evaluation of Jane's case.

Meaningful review is frustrated because the ALJ addressed Drs. Glaser's and Welsh's opinions together, despite the considerable differences between their assessments. [*See* Dkt. 5-22 at 32-36 (Dr. Glaser's opinion), *compared with*, Dkt. 5-31 at 3-7 (Dr. Welsh's opinion, including that Jane could sit, stand, and walk in combination for only four hours in a workday).] The applicable regulation requires only "[s]ource-level articulation." 20 C.F.R. § 404.1520c(b)(1). The regulations explain that when a medical source provides multiple medical opinions, the ALJ will not consider all the factors to evaluate each separate opinion individually but is required to only "articulate how [he] considered the medical opinions . . . from that medical source together in a single analysis using the factors . . . as appropriate." *Id.* But the regulation does not explain that the ALJ may address multiple sources' opinions together in a single analysis. Here, the ALJ did not satisfy even the relaxed requirement that he articulate his consideration of the opinions at the source level.

---

[7] The VE testified that Jane did not have any skills from her past relevant work that would transfer to sedentary occupations with very little, if any, vocational adjustment. [Dkt. 5-2 at 55.] By regulation, if a claimant is of advanced age (age 55 or older) and limited to no more than sedentary work or closely approaching retirement age (age 60 or older) and limited to light work, the SSA will find that she has "skills that are transferable to skilled or semiskilled . . . work only if the . . . work is so similar to [her] previous work that [she] would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." 20 C.F.R. § 404.1568(d)(4). The VE was not asked if there were occupations at the light exertional level that Jane—who was closely approaching retirement age during a portion of the period at issue— could perform based on transferable skills with very little vocational adjustment, nor was it fleshed out whether any such occupations would be viable if she were limited in accordance with Dr. Glaser's opinion.

The further problem with the ALJ's approach is that some of the ALJ's limited express reasoning does not apply to Dr. Glaser's opinion. The ALJ found it notable that Jane testified that her doctor placed restrictions on her that were inconsistent with her treating source opinions. The only example that the ALJ gave was that Jane testified that she could lift up to 20 pounds and her doctor told her not to lift anything heavier. Jane testified that her doctor told her not to lift more than 20 pounds, she had trouble with bending and lifting because of hernia-related issues, she did no lifting at home, and she gave examples that she could no longer carry in firewood for her stove, pull wet towels from the washer, or pick something up off the floor. [Dkt. 5-2 at 40-41.] Jane's relevant testimony is not inconsistent with Dr. Glaser's opinion. Indeed, the ALJ explained that his RFC finding was consistent with Dr. Glaser's assessment that Jane could not lift and carry more than 20 pounds. The ALJ's conflated analysis of Jane's treating opinions on this point does not provide a basis to reject Dr. Glaser's opinion.

The ALJ alluded to the most important factors that he must explain his consideration of—supportability and consistency—when he concluded that Jane's treating source opinions were not supported by or consistent with the record. The Commissioner endeavors to find examples of Dr. Glaser's opinion being internally inconsistent or at least poorly supported by the evidence that he referenced in the opinion. But "[u]nder the *Chenery* doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace." *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.") (additional citations omitted)). Here, the ALJ did not give any examples of Dr. Glaser's assessments being inconsistent with one another, nor did he analyze the explanations that Dr. Glaser provided to support his opinion. In fact, the ALJ did not

demonstrate that he considered any of the specific limitations that were assessed by Dr. Glaser except the one concerning lifting and carrying that he explained was consistent with his RFC finding.

Dr. Glaser explained that his opinion was supported, in part, by Jane's coronary artery disease, reported hip pain related to bursitis, and inguinal pain related to a history of three surgeries for hernias. [Dkt. 5-22 at 32.] He also explained that her inguinal pain worsened with prolonged sitting, standing, and movement, and she moved slowly getting onto an exam table. [Dkt. 5-22 at 32.] He further explained that one of Jane's medications, Lipitor,[8] bothered "her muscles a little." [Dkt. 5-22 at 32.] Dr. Glaser also noted that Jane had shortness of breath with moderate exertion. [Dkt. 5-22 at 32.] The Court does not find Dr. Glaser's rationales so obviously insufficient to support the modest limitations that he assessed that the ALJ could disregard Dr. Glaser's opinion on a supportability basis without the ALJ providing any explanation of his reasoning.

Moreover, Dr. Glaser's rationales are supported by the record, including by objective evidence. By history, in September 2018, Jane was admitted to the hospital with chest pains and elevated troponin levels and a stent was placed due to obstructive one-vessel coronary artery disease and a diagnosis of a non-ST elevated myocardial infarction. [Dkt. 5-11 at 10-11.]

Concerning Jane's hip bursitis, on May 7, 2019, an examination of her left hip recorded tenderness to palpation over the trochanteric bursa and weakness with hip abduction. [Dkt. 5-14 at 72.] An MRI taken, on May 9, 2019, showed severe left gluteus minimus tendinopathy with a

---

[8] Lipitor is a named brand of the generic, atorvastatin, a medication that "treats high cholesterol and reduces the risk of heart attack and stroke. It works by decreasing bad cholesterol and fats (such as LDL, triglycerides) and increasing good cholesterol (HDL) in your blood. It belongs to a group of medications called statins." *Atorvastatin Tablets*, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/19081-atorvastatin-tablets (last visited December 27, 2022).

chronic-appearing high-grade full-thickness/near full-thickness tear and associated moderate muscular atrophy. [Dkt. 5-14 at 74-75.] On September 4, 2019, Jane was treated for hip pain and a diagnosis of bilateral trochanteric bursitis that was recurrent on the left. [Dkt. 5-14 at 61.] She was given a second cortisone injection in the left hip for "temporary relief," but the notes indicated that would be "the last cortisone injection for the left side due to fear of making this worse." [Dkt. 5-14 at 61.] Her provider explained that she could consider another cortisone injection in the right hip and a platelet-rich plasma injection was recommended for the left hip, but "the patient [was] unable to proceed due to the cost." [Dkt. 5-14 at 61.]

Regarding hernias, on May 14, 2019, Dr. Welsh, a general surgeon, examined Jane and recorded her appearance as "acutely" and "chronically ill," an inguinal hernia was demonstrated, and she was diagnosed with a recurrent inguinal hernia. [Dkt. 5-15 at 45.] On June 4, 2019, Dr. Welsh described Jane as acutely and chronically ill, and he recorded that she had abdominal tenderness. [Dkt. 5-15 at 72.] On June 20, 2019, she was again described as appearing acutely ill and her examination continued to show right lower quadrant tenderness and an inguinal hernia. [Dkt. 5-15 at 39.] On September 13, 2019, Dr. Welsh performed surgery on Jane to repair a recurrent right inguinal hernia and a mesh was placed. [Dkt. 5-15 at 11.] On October 25, 2019, Dr. Welsh recorded that Jane once again appeared acutely ill with "epigastric" and "RLQ tenderness," though her abdomen was "non-distended," and no hernias were palpable. [Dkt. 5-19 at 56.] On March 9, 2020, Jane appeared chronically ill with epigastric and right lower quadrant tenderness, but no hernias were palpable. [Dkt. 5-19 at 50.] On July 9, 2020, Dr. Welsh saw Jane for multiple medical problems, including epigastric and right upper quadrant pain postprandial, reflux symptoms, constipation, indigestion, and increasing issues concerning possible rectocele. [Dkt. 5-21 at 47.] She again appeared chronically ill, and the examination recorded that she

epigastric and right lower quadrant tenderness. [Dkt. 5-21 at 48.] On September 15, 2020, her examination was the same. [Dkt. 5-21 at 43.] On October 5, 2020, Dr. Welsh continued to record that Jane had abdominal tenderness on examination. [Dkt. 5-22 at 5.]

Concerning Dr. Glaser's treatment records, on June 22, 2020, he recorded that Jane had right inguinal tenderness on examination. [Dkt. 5-20 at 25.] On August 31, 2020, Dr. Glaser noted bilateral midabdominal tenderness. [Dkt. 5-20 at 19.] On September 2, 2020, Dr. Glaser recorded that Jane's heart rate was "very tachycardic," she had "some bilateral low-mid abdominal tenderness," and "some right [costovertebral angle] tenderness." [Dkt. 5-20 at 11.]

Regarding Lipitor, on August 5, 2020, Jane was evaluated by cardiology because she had "been struggling with increasing muscle weakness and diffuse muscle aching," it was noted that after consulting with a nurse at the provider she had discontinued her statin medication four days prior, bloodwork revealed in relevant part that her creatine phosphokinase levels were mildly elevated, and she reported that she noticed some improvement with her symptoms after stopping her statin. [Dkt. 5-23 at 12; Dkt. 5-23 at 67.] On September 6, 2020, Jane visited the emergency room after taking two doses of nitroglycerine at home because of dull chest pains and mild shortness of breath. [Dkt. 5-24 at 5.] On September 23, 2020, she returned to the cardiology clinic and the provided noted her history of symptoms while on high-dose atorvastatin with elevated creatine phosphokinase levels, she was taken off of the medication for several weeks and reported improvement, "doing well," but not complete resolution of her complaints, she had resumed the atorvastatin after developing cardiac symptoms, and she reported feeling some weakness in her legs at the end of the day after resuming the medication. [Dkt. 5-23 at 8.]

Even considering the ALJ's decision as a whole, the Court is not able to find a logical bridge from the evidence of record to the ALJ's conclusions that Dr. Glaser's opinion was not

supported by or consistent with the record because of Jane's examinations, treatment history, and daily activities. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.7 (7th Cir. 2004) ("it is proper to read the ALJ's decision as a whole, and . . . it would be needless formality to have the ALJ repeat substantially similar factual analyses" throughout the decision). In the context of Dr. Glaser's opinion—including the limitations that he assessed, the explanations that he provided, and the nature of the impairments that he expressly relied on—there is no apparent logical bridge to the ALJ's conclusions. As explained above, Jane received considerable treatment for coronary artery disease and recurrent hernias, including surgical intervention, and she remained on necessary medication despite reporting significant, relevant side effects. Examinations continued to show abdominal tenderness after her most recent surgery. Imaging demonstrated muscle atrophy because of her hip issues, she had relevant weakness on examination, further injections were not recommended because of concerns it would make her hip issues worse, and she declined further recommended treatment because of the associated cost. The ALJ relied on rather minimal daily activities—like taking "short trips" including to the grocery store—that he concluded "involve lifting and bending, [that was] not supportive of a finding of disability." [*See* Dkt. 5-2 at 19.] But Jane and her husband qualified her performance of those activities, for instance, that she could not carry the groceries in. [Dkt. 5-8 at 33.] Those activities do not appear obviously inconsistent with Dr. Glaser's opinion. At a minimum, the Court cannot discern a logical bridge from the relevant evidence without any explicit analysis provided by the ALJ that demonstrates that he has considered Dr. Glaser's specific assessments and supporting explanations. Accordingly, remand is necessary for further consideration of Dr. Glaser's opinion.

### B. Other Arguments

Having found remand supported by the need for further consideration of Dr. Glaser's opinion, the Court declines to detail analyses of Jane's remaining arguments. On remand, further consideration of Jane's RFC, the other medical assessments, and the relevant evidence of record including any updated evidence is necessary along with further consideration of Dr. Glaser's opinion.

### IV. CONCLUSION

For the reasons explained above, the Court **REVERSES** the ALJ's decision denying Jane benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C.§ 405(g) (sentence 4) as detailed above.

**SO ORDERED.**

Date: 12/30/2022

Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all ECF-registered counsel of record via email generated by the Court's ECF system.